HOSPITAL CONSULTANTS, INC., et al., Appellants,

v.

James S. POTYKA, M.D., et al., Appellees.

Rodney D. BOBBITT, M.D., et al., Appellants,

v.

Tedd CROW, Appellee.

Nos. 15406, 15407.

Court of Civil Appeals of Texas, San Antonio.

Nov. 26, 1975.

Rehearing Denied Dec. 31, 1975.

Rique D. Bobbitt, Houston, Patrick Priest, San Antonio, for appellants.

George W. Krog, San Antonio, for appellees.

CADENA, Justice.

In our No. 15406 plaintiffs, Dr. James S. Potyka and Dr. James Larry Miller, sued defendants, Hospital Consultants, Inc. (a Texas Corporation), Dr. Rodney D. Bobbitt and the Baptist Memorial Hospital System, seeking (1) judgment declaring unenforceable certain covenants contained in an agreement between Dr. Bobbitt and Baptist Memorial Hospital System and in contracts between each plaintiff and Hospital Consultants, Inc.; and (2) an injunction preventing Dr. Bobbitt and Hospital Consultants, Inc., from attempting to enforce such covenants which allegedly had the effect of preventing or, at least, severely restricting, the practice of emergency room medicine by Dr. Potyka and Dr. Miller.

In No. 15407 Dr. Tedd Crow, as plaintiff, sought essentially the same relief against the same defendants with reference to the covenant in the contract between Dr. Bobbitt and Baptist Memorial Hospital System and a covenant contained in a contract between Dr. Bobbitt and Dr. Crow.

The cases were consolidated for the purpose of trial but, following trial without a jury, the trial court rendered separate judgments in each case. Each judgment declares the covenants to be unenforceable and restrains Dr. Bobbitt from attempting to enforce the covenant in his contract with Baptist Memorial Hospital System. Only Dr. Bobbitt and Hospital Consultants, Inc., have perfected appeals, and we consolidated the cases for argument and decision.

Plaintiffs, Dr. Miller, Dr. Potyka and Dr. Crow will be referred to by their surnames or, collectively, as "plaintiffs." Dr. Bobbitt will be identified as "Bobbitt." Hospital Consultants, Inc., will be designated as

"corporation", while Baptist Memorial Hospital System will be referred to as "Baptist."

By instruments dated December 24, 1971, Bobbitt and Baptist agreed that Bobbitt, in consideration of payment to him by Baptist of $17,500.00 per month, would furnish competent physicians to staff the emergency rooms of hospitals operated by Baptist on a 24-hour basis. Baptist was to make no payments to the doctors assigned to its emergency rooms, since the agreement contemplated that such doctors would collect, and retain for their own use, the customary fees from the patients they attended in the emergency rooms. This contract contained the following provision, which is the covenant which Bobbitt has been enjoined from enforcing:

> So long as an Emergency Room Physician is under contract with [Bobbitt] to provide professional services in the emergency room of any hospital, and for a period of three (3) years thereafter, Baptist and/or Hospitals shall not contract with said Emergency Room Physician to otherwise perform professional services in the emergency room of any Hospital, or allow said Emergency Room Physician to provide professional services in the emergency room of any Hospital, except as provided for in his contract with [Bobbitt]. It is understood that the foregoing provisions are for the protection of the rights of [Bobbitt] and are not intended to restrict the rights and privileges of a physician to become an active member of the medical staff of any Hospital after ending his contractual relationships with [Bobbitt].

The contract also recited that since the damages resulting to Bobbitt as a result of a breach of the agreement by Baptist, would be difficult to ascertain, breach of the contract by Baptist would render it liable to Dr. Bobbitt in the sum of $50,-000.00, which sum was described as "liquidated damages and not . . . a penalty."

Subsequently, Bobbitt and others took steps to form the defendant corporation, Hospital Consultants, Inc. Bobbitt's name, however, does not appear in the articles of incorporation which were filed on September 15, 1972. The principal activity of this corporation was the negotiation of contracts with hospitals in Texas such as the one executed in 1971 between Bobbitt and Baptist. Bobbitt owns stock in this corporation.

Despite his involvement in the formation of, and his ownership of stock in, the corporation, and despite the fact that he appears to have taken an active part in the management of the affairs of the corporation, Bobbitt, on February 23, 1973 (some 4 months after the formation of the corporation), entered into a contract with Crow, one of the plaintiffs, according to which Crow agreed to assume responsibility "for examining every person who presents himself for care and/or treatment at the emergency room of the hospital to which he is assigned. . ." The instrument recited that Bobbitt had entered into contracts with various hospitals to provide emergency room services, and that the purpose of the agreement was "to enable Bobbitt to comply with his contracts with said hospitals, while enabling Crow to obtain substantial compensation for the exercise of his professional skills." The contract contained the following restrictive covenant:

> . . . CROW agrees that he will not enter into competition with BOBBITT by contracting or otherwise arranging to provide emergency room services for any hospital within a fifty (50) mile radius of any hospital to which he may be assigned, for a period of three (3) years following termination of this agreement, nor will he enter into an agreement similar to this agreement with any person or group of persons during said three (3) year period. Provided, however, that CROW shall be free to enter into a partnership or professional association with other medical doctors, so long as the terms of the partnership agreement or the articles of association or by-laws of the professional associ-

ation do not abrogate or conflict with his obligations hereunder.

The instrument identifies Bobbitt and Crow as the parties to the contract. The corporation is nowhere mentioned, and the agreement is signed by Bobbitt with nothing to indicate that he signed the instrument in other than his individual, as distinguished from a representative, capacity.

Miller, on May 1, 1973, and Potyka, on June 22, 1973, signed contracts similar to the Bobbitt-Crow agreement, except that the Miller and Potyka contracts were with the corporation, rather than with Dr. Bobbitt. Although Bobbitt signed these agreements on behalf of the corporation, he is nowhere mentioned in the body of the agreement. The Miller and Potyka contracts recite that the corporation has entered into contracts to provide emergency room service for various hospitals, but it contains no reference to the Bobbitt-Baptist contract nor to any other contract to which Bobbitt is, or was, a party.

All three plaintiffs were assigned to work in emergency rooms of hospitals operated by Baptist in Bexar County. In the fall of 1973 or, perhaps, sooner, plaintiffs began to hear rumors that Baptist would not renew its contract with Bobbitt when such contract expired on April 25, 1974. Plaintiffs met with Bobbitt early in December, 1974, and questioned him about the matter. Bobbitt acknowledged that there were differences between him and Baptist's administrator, but he assured them that these differences would be resolved and that, in any event, because of his influence with members of Baptist's board of trustees, the contract would be renewed. He added that if the Baptist contract was not renewed, plaintiffs would be released from their contracts, except that he would not consent to their working in the emergency room of any Baptist hospital.

The Bobbitt-Baptist contract was not renewed when it expired on April 25, 1974. Instead, Baptist signed a 2-year contract for the provision of emergency room services in its hospitals with a partnership doing business under the name of Emergency Room Affiliates. Plaintiffs agreed to work in the Baptist emergency rooms for this partnership, but Baptist refused to permit them to do so because of the restrictive provision in its contract with Bobbitt. Plaintiffs then filed the suits which are now before us and, under protection of a temporary injunction, began working at Baptist's emergency rooms. Emergency Room Affiliates does not require that its doctors sign written agreements.

At the time of trial, Bobbitt had no emergency-room contract with any hospital located in Bexar County. The corporation has never had any such contract with Baptist or with any hospital located within a 50-mile radius of a hospital operated by Baptist. Both Bobbitt and the corporation are still actively seeking to negotiate similar contracts with hospitals in Bexar County and elsewhere in Texas. There is testimony concerning other contracts with hospitals in other cities, but it is not clear whether Bobbitt or the corporation is a party to such contracts.

We consider first the noncompetition agreements contained in the Bobbitt-Crow contract and in the contracts of Miller and Potyka with the corporation.

The trial court concluded that the individual contracts of plaintiffs with Bobbitt and with the corporation do not create the relationship of employer-employee, but, rather, the relationship of contractor-subcontractor, and that restrictive covenants against competition may not be applied to subcontractors beyond the term for which the subcontractor agrees to render exclusive service. Defendants' fifth and sixth points challenge these conclusions. For the purposes of this opinion, we will assume that the rules applicable to a subcontractor's agreement not to compete with the contractor are the same as those applicable to an agreement by an employee not to compete with his employer. We will, therefore, discuss the problem in terms of an employee's

agreement not to compete with his employer.

■ A covenant restraining an employee from competing with his employer on termination of the employment is valid if it is reasonable in view of the circumstances of the particular case. In *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950, 951 (1960), our Supreme Court said that a postemployment restraint is reasonable, assuming that the public interest is not directly involved, if it does not impose on the employee "any greater restraint than is reasonably necessary to protect the business and good will of the employer." Cf., 2 Restatement, Contracts Secs. 513–15 (1932).

Bobbitt testified that his fear, which he described as "paranoid", was that the hospitals and doctors whom he had brought together would decide to deal with each other directly, eliminating Bobbitt.

■ Most courts recognize that an employer has a sufficient interest in retaining his customers to support an employee's covenant whenever the employee's relationship with customers is such that there is a substantial risk that he may be able to divert all or part of their business. This is the "customer contact" which is discussed, along with its limitations, in *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685, 705–09 (Ohio Com.Pl.1952). Clearly, whether the risk is great enough to justify the restriction, and the extent of the permissible restriction, must depend on the extent to which the employee is likely to be identified in the mind of the customer with the product or service being sold. The most important considerations are the frequency of the employee's contacts with customers and whether they are the employer's only contacts or relationships with such customers; the locale of the contact; and the nature of the functions performed by the employee. Blake, Employee Agreements Not To Compete, 73 Harv.L.Rev. 625, 659 (1960).

The evidence clearly establishes that plaintiffs performed their duties only on the premises of Baptist, that is, on the customer's premises. However, the evidence does not establish that the circumstances were such as to establish any sort of rapport between the emergency room physicians and Baptist's administrator or board of trustees. The evidence supports the conclusion that Bobbitt was in close contact with the persons at Baptist who were in a position to determine whether Baptist would or would not continue to deal with Bobbitt. Bobbitt's loss of Baptist as a "customer" was not due to the fact that the emergency room physicians, because of their close association with Baptist, became identified in Baptist's mind with the service being sold by Bobbitt. There is more than ample testimony to support the conclusion that Baptist's failure to renew the Bobbitt contract was the result of dissatisfaction with Bobbitt and the manner in which he was performing under his contract, rather than the result of any desire by Baptist to deal directly with the emergency room physicians. Baptist did not opt to deal with these physicians directly, thus eliminating Bobbitt. Baptist chose to contract with Emergency Room Affiliates instead of with Bobbitt, and there is nothing to compel the conclusion that the emergency room physicians influenced this decision in any way. The decision by Baptist was not based on a desire to continue its association with the emergency room doctors. In fact, after it had chosen to contract with Emergency Room Affiliates, Baptist refused to allow the emergency room doctors to render professional services in its emergency rooms. In short, the evidence shows that plaintiffs did not "pirate" Bobbitt's customer. It was not until Bobbitt had been replaced by Emergency Room Affiliates that plaintiffs sought to perform their professional services in Baptist's emergency rooms under the direction of someone other than Bobbitt.

What we have said, although couched in terms of "emergency room physicians" is really applicable only to plaintiff, Crow,

since he was the only doctor who had a contract with Bobbitt, and Bobbitt was the only person who could claim Baptist as a customer. Miller and Potyka had no contractual relations with Bobbitt. Their contract was with the corporation, and Baptist was not the customer of the corporation. Neither Bobbitt nor the corporation contends that the corporation was merely the alter ego of Bobbitt, and there is no finding to that effect.

Another important purpose sought to be achieved by an employee restraint, in addition to preservation of the employer's customers, is preventing valuable business information obtained by employees from being used by a competitor. This is the so-called "trade secrets" doctrine. Here the trial court found that there are no "customer lists, sales or trade techniques, new methods, prospect lists, secret processes, corporate good will or commercial procedures" that plaintiffs "could appropriate to their own use or to the use of another person or could use unfairly to compete with" Bobbitt or the corporation. In addition, the trial court found that the "knowledge and training of plaintiffs was not uniquely valuable" to Bobbitt or the corporation, and that the business of furnishing licensed physicians to render emergency room treatment "is not one in which the competitive nature of the service provides the physicians with unfair knowledge of their employer's business." These findings and conclusions are challenged by defendants' points 20, 21, 22 and 23.

There is testimony to the effect that Bobbitt conducted a training program for the emergency room physicians; that he purchased videotape equipment for this purpose; and that he paid their expenses so that they could attend conventions at which they could gain knowledge in the field of emergency medicine. There is evidence that the emergency room physicians became more competent and better qualified to practice emergency medicine than a general practitioner.

■ We are unwilling to hold that general knowledge, skill or facility acquired through training or experience while working for an employer become the "property" of the employer. Such knowledge and skill appertain exclusively to the employee, even though they were acquired by on-the-job training which was extensive and costly. *Club Aluminum Co. v. Young*, 263 Mass. 223, 160 N.E. 804 (1928). The result might be different if the evidence establishes that the training methods were, in fact, a "secret" of the employer. There is nothing in the record to indicate that the training procedures were developed by, and known exclusively to, Bobbitt. The fact that he used videotapes which he apparently purchased on the open market, and that he sent the doctors to conventions indicated that the special "training" was something less than Bobbitt's secret. There is nothing to indicate that Bobbitt confided in the doctors by revealing to them special techniques known only to him. It may be safely assumed that the emergency room physician became more adept because of the fact that they labored regularly in emergency rooms. But the knowledge they thus acquired was not imparted to them in confidence by the employer. Every employee learns by experience, whether the experience be in digging a ditch or in setting a broken bone. Essentially, the problem is one of breach of trust or confidence. There can be no betrayal of confidence unless there is a confidence to betray. *National Starch Products, Inc. v. Polymer Industries, Inc.*, 273 App.Div. 732, 79 N.Y.S.2d 357 (1948); Blake, *op. cit.*, 73 Harv.L.Rev. at 668.

Again, the difference in the situations of Crow, on the one hand, and Miller and Potyka on the other must be kept in mind. There is no evidence that Potyka and Miller received any training whatever from the corporation with which they had contracted.

■ Under the circumstances of this case, the interpretation of the restrictive covenants for which defendants contend would make the agreements unreasonable,

since they impose on plaintiffs a restraint more onerous than is reasonably required for the protection of the business and goodwill of defendants. To prevent plaintiffs from being employed by Emergency Room Affiliates endangers no protectible interests of defendants, and the sole purpose of the restriction, if so interpreted, would be to prevent Emergency Room Affiliates, or other similar groups, from competing with defendants. In the absence of special circumstances, a covenant which has as its sole purpose the elimination of competition is not reasonable. The special circumstances which have been traditionally recognized, such as customer lists, "pirating" of the employer's customers because of the close association between employee and such customers, secret techniques, etc. are not present here.

It is true that there are cases, such as those involving sale of a business or goodwill, where a restrictive covenant has been enforced although its sole objective is the elimination of competition. But a restrictive covenant in connection with the sale of a business or goodwill is quite different from a post-employment restriction. A transfer of goodwill cannot be accomplished effectively unless the transferor agrees not to diminish the value of the thing transferred by refraining from competing with his transferee. Such a restraint is necessary in order to insure that the transferee will receive the full value of the thing which he is acquiring. An employee restraint is not necessary in order to insure that the employer is getting the full value of that which is acquiring by the employment contract. What he is acquiring in the employment case is simply the current services of the employee. The transfer of a business or goodwill of itself furnished, by its very nature, the special circumstances which make the transferor's agreement not to compete reasonable and enforceable. Decisions involving restraints in connection with the sale of a business or goodwill, therefore, have little persuasive effect in cases involving post-employment restrictions. 2 Restatement, Contracts Sec. 515, comment b (1932); Carpenter, Validity of Contracts Not To Compete, 76 U. of Pa.L.Rev. 244, 267 (1928).

■ The burden was on defendants to establish the existence of facts which will support the legal conclusion that the restriction is reasonable. *Weber v. Hesse Envelope Co.*, 342 S.W.2d 652 (Tex.Civ.App.— Dallas 1960, no writ); *Denny v. Roth*, 296 S.W.2d 944, 947 (Tex.Civ.App.—Galveston 1957, writ ref'd). Considering the record as a whole, it cannot be said that the trial court's refusal to find the existence of facts which would support the legal conclusion of reasonableness is contrary to the weight and preponderance of the evidence.

Our conclusion requires that defendants' points 5, 6, 7, 10, 11, 12, 20, 21, 22 and 23 be overruled.

Since we have decided that the restrictions in the contracts of the individual plaintiffs are unreasonable as written, we need not consider defendants' points challenging the trial court's conclusion that the Bobbitt-Baptist contract and the individual contract of Crow with Bobbitt, and the contracts of Miller and Potyka with the corporation must be treated as component parts of a single transaction, so that the invalidity of the restriction in the Bobbitt-Baptist permeates the entire transaction and renders plaintiffs' individual agreements unenforceable. Defendants' points 1, 2 and 4 present no grounds for reversal.

We express no opinion on whether the restrictive covenants violate the provisions of the Texas Antitrust Act.

Defendants' remaining points complain of that portion of the judgment invalidating the covenant in the Bobbitt-Baptist agreement.

With reference to Miller and Potyka, it must be noted that the restraint on Baptist does no more than limit Baptist's conduct with reference to emergency room physicians who are under contract, or have been under contract, with Bobbitt. The contract

expressly recites that the restriction is for the protection of Bobbitt. There is nothing in the language of the restriction which indicates an intention to curtail Baptist's freedom to deal with doctors who have entered into contractual relations with any person or entity other than Bobbitt, nor is there any suggestion in the agreement that the restriction was intended to protect the corporation. The corporation was not in existence at the time of the execution of the agreement, and there is no evidence to support the conclusion that, at the time it entered into the agreement, Baptist had any reason to expect that the corporation would be subsequently formed.

The record does not disclose that Bobbitt at any time assigned his rights under his contract with Baptist to the corporation, nor that the corporation assigned its rights under its contracts with Miller and Potyka to Bobbitt.

On the basis of the record before us, there is no basis for holding that the corporation has any interest in the enforceability of the Bobbitt-Baptist contract. As far as Bobbitt's rights under such contract are concerned, they extend no further, assuming the restriction to be valid, than the right to insist that Baptist desist from dealing with persons under contract to Bobbitt. Since Miller and Potyka have never entered into any contract with Bobbitt, as distinguished from the corporation, the covenant, by its express terms, in no way circumscribes Baptist's rights to deal with them.

The third plaintiff, Crow, of course, entered into a contract with Bobbitt and he is included within the class of persons designated in the agreement. We must, then, consider the validity of the restriction contained in the Bobbitt-Baptist contract in determining the rights of Crow.

We know of no case involving a covenant similar to that which we are now considering. It clearly is quite different from the ordinary post-employment restriction, since, assuming that the relationship between Bobbitt and Baptist is that of employer (Baptist) and employee (Bobbitt), the restriction here is on the employer, rather than on the employee. In using the terms "employer" and "employee," we do not ignore the fact that the contract recites that the relationship between Baptist and Bobbitt under the contract is not that of employer and employee, since Bobbitt and the physicians with whom he might contract are not subject to the supervision, management, direction or control of Baptist in the performance of their professional duties.

Essentially, the covenant is an agreement by Baptist not to "employ" any physician who was, or had been within the preceding three years, under contract with Bobbitt. Except for its unilateral character, the agreement is similar to "no-switching" agreements under which the parties agree not to employ each others' former employees until the expiration of a specified period following the termination of the former employment. Such agreements have generally been held invalid. Anno: 2 A.L.R.Fed. 839 (1969). However, such decisions have been based on provisions of applicable antitrust laws.

It is one thing to uphold a restraint as reasonable where it results from an agreement freely entered into by the person whose commercial activities are being restricted. Such a conclusion is the result of the weighing of several policy considerations, not the least of which is our traditional reverence for a person's freedom to contract. But where the restriction on B's freedom results, not from B's voluntary agreement with A, but from A's agreement with C, the difference in the situation and in the policy considerations to be balanced is obvious. In the one case B voluntarily relinquishes his freedom in order to obtain a benefit which, at the time of such relinquishment, he considered desirable. In the other situation B is deprived of his freedom without his acquiescence and with no resulting benefit to him.

Bobbitt testified that he insisted on the inclusion of the restriction in his contract

with Baptist because of his fear, which he described as "paranoid," that once he had complied with his obligation to assure "coverage" of Baptist's emergency rooms, it would be "very easy" for Baptist and the physicians whom he had "brought together" to "eliminate" him.

Much, if not all, of what we said in connection with the validity of the restriction in Crow's contract with Bobbitt is applicable here. Bobbitt's loss of Baptist as a customer was not the result of a desire on the part of Baptist, because of its close association with Crow, to deal with Crow rather than with Bobbitt. Even if we assume that Crow, because of his frequent presence in Baptist's emergency rooms, would be able to form such a close relationship with Baptist's officers and place himself in a position to "steal" Bobbitt's customer, Bobbitt would be amply protected from this eventuality if the restriction on Baptist merely restrained Baptist from entering into a contract with any physician under contract to Bobbitt who performed professional services in Baptist's emergency rooms. But the restriction goes beyond this. It prevents Baptist from entering into a contract, similar to its contract with Bobbitt, with any physician under contract with Bobbitt, even if such physician had not performed services in the Baptist emergency rooms. It requires great imagination to understand how a physician assigned to another hospital and who had had no association whatever with Baptist, would be in a position to take advantage of the fact that he had been assigned to such other hospital in order to induce Baptist to "eliminate" Bobbitt.

With specific reference to Crow, the covenant does more than prevent Baptist from entering into a contract with Crow similar to its contract with Bobbitt. The restriction would prevent Crow from rendering professional services in the Baptist emergency rooms even if he has no contractual relations with Baptist. The distinction between the two situations is made clear by the record before us. Crow has made no

agreement with Baptist. His agreement, if any, is with Emergency Room Affiliates. In the absence of facts making the "customer contact" theory applicable or showing a breach of trust or confidence arising from improper use by Crow of Bobbitt's trade secrets, customer list, etc., enforcement of the Bobbitt-Baptist covenant would only have the effect of insulating Bobbitt against competition by Emergency Room Affiliates.

The judgment of the trial court is affirmed.